THOMAS J. HIGGINS *et al.*, Plaintiffs-Appellees, *v.* BRUNSWICK
CORPORATION, Defendant-Appellant.

First District (3rd Division) No. 78-1039

Opinion filed September 12, 1979.

Watson B. Tucker and Michael R. Feagley, both of Chicago (Mayer, Brown & Platt, of counsel), for appellant.

Raymond P. Concannon, of Miller & Concannon, of Chicago, for appellees.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiffs, Thomas J. and Lorraine Higgins, brought this action in chancery to cancel a lease entered into between them as lessors, and defendant, Brunswick Corp., as lessee. After a trial without a jury, the trial court entered judgment cancelling the lease and ordering Brunswick to vacate the premises and to leave its personal property behind. The court ruled that plaintiffs entered the lease because of duress and undue influence exercised by Brunswick. On appeal Brunswick contends that plaintiffs' action was barred by the doctrine of laches; that the action was barred by res judicata and collateral estoppel; that plaintiffs lacked standing to bring the action; and that the court erred in finding that plaintiffs signed the lease because of duress or undue influence exercised by Brunswick.

In February 1962, Thomas Higgins, a real estate broker and builder, erected a bowling alley, containing a cocktail lounge, at 3660 West 111th Street in Chicago. To do so, he borrowed $150,000 from a savings and loan association. He purchased 16 bowling alleys, automatic pinsetters and other bowling equipment from Brunswick at a cost of $269,479.84. Plaintiffs paid $17,692 in cash for this equipment and executed conditional sales notes in favor of Brunswick in the amount of $251,787.84. Title to the equipment remained in Brunswick until the entire purchase price was paid, and Brunswick was authorized to repossess the equipment in case of plaintiffs' default. Sixteen months later, plaintiffs were $4320 in arrears to Brunswick.

In February 1964, after discussions with Brunswick representatives, plaintiffs ordered additional bowling equipment designed to modernize existing equipment and to increase sales revenue. Plaintiffs paid $2,348.80 in cash to Brunswick and executed conditional sales notes in the amount of $24,517.76. Plaintiffs renegotiated their obligation with Brunswick, which extended the length of their payment period without increasing monthly payments. Plaintiffs were also required to personally guarantee the purchase of the new equipment. Plaintiffs thereafter failed to make

any payments to Brunswick and from March 1964 to March 1965, attempted unsuccessfully to again renegotiate the obligations.

On April 1, 1965, plaintiffs and Brunswick tentatively agreed to a lease arrangement of the premises whereby Brunswick would release plaintiffs from their personal guarantees and pay rent to plaintiffs. In return, plaintiffs would lease the entire operation to Brunswick. The premises would also be used as a test center for new Brunswick bowling equipment. Under the lease terms, plaintiffs would have an additional 60 days to pay their outstanding debts for the equipment or surrender possession of the premises and lease it to Brunswick. On May 28, 1965, three days before Brunswick was to take possession of the bowling alley, plaintiffs filed for bankruptcy in Federal court. In that action, they sought to restrain Brunswick from repossessing its equipment or taking possession of the premises.

On July 2, 1965, Brunswick filed an action against plaintiffs in the circuit court of Cook County for $215,700, the balance outstanding on plaintiffs' bowling equipment purchases. Brunswick additionally sought repossession of the equipment. Brunswick also petitioned the bankruptcy court for an order requiring plaintiffs to surrender the premises as per their agreement. The bankruptcy court appointed a receiver and arranged a meeting in which the receiver, plaintiff Thomas Higgins, plaintiffs' attorney, and Brunswick representatives were present. In the negotiations that followed, Brunswick agreed to dismiss its lawsuit against plaintiffs and to pay off plaintiffs' unsecured creditors in exchange for the lease of the building. The receiver authorized the arrangement and, on motion of plaintiffs, the bankruptcy court dismissed the bankruptcy petition. The lease agreement was not presented in the Federal court.

The lease provided that plaintiffs were to receive $22,000 a year as rent from Brunswick. That amount covered the mortgage, taxes and insurance on the establishment. Brunswick received a lease for 24 months with renewal options totalling 19 years. Plaintiffs were responsible for maintenance and repair costs in excess of $50.

After the lease was executed, Brunswick dismissed all proceedings against plaintiffs and paid their unsecured creditors. In 1966, Brunswick received correspondence from an attorney for plaintiffs who demanded that Brunswick perform in strict conformity with the lease. In 1972 and again in 1975, Brunswick refused plaintiffs' offer to purchase the operation. In August 1973, plaintiffs proposed to sell the premises to Brunswick for $200,000 but this also was refused. Plaintiffs refused Brunswick's counteroffer after their 1975 attempt to purchase.

In March 1976, LaSalle National Bank, as trustee of the land trust which held title to the premises in question, transferred title to Marquette National Bank, trustee of another trust in which the sole beneficiary was

Thomas Higgins. Thereafter, plaintiffs and LaSalle assigned their interest in the lease to Marquette, as trustee, and directed Brunswick to pay the rent to Marquette.

On July 20, 1976, plaintiffs filed the present action for rescission and cancellation of the lease. They alleged that the lease was signed under duress and that its terms were unconscionable.

In support of their suit plaintiffs introduced evidence of rental income and expenses for the bowling establishment for the years 1975, 1976, and 1977, which showed a total net profit of only $778.41. They also introduced requests from Brunswick for repairs to the premises in the amount of $30,000. Plaintiffs introduced Brunswick's financial projections for the business which indicated a gross profit of $250,000 per year.

Brunswick presented actual figures indicating that the combined net profits of the business for the years 1966, 1967, and 1968 were only $10,286. Brunswick also introduced evidence that over the years different attorneys for plaintiffs had reviewed the lease without recommending action. At the time the present complaint was filed, Brunswick had been in possession for 11 years and had paid $244,000 in rent to plaintiffs. Evidence was also introduced that plaintiffs had a serious under-capitalization problem and poor cash flow at the time of setting up the business.

William Francis, a Brunswick sales engineer, testified that he evaluated the business enterprise on behalf of Brunswick. He believed the bowling establishment was a financially attractive investment for Brunswick as a test center for new equipment and that a lease arrangement with plaintiffs was advisable. Francis' financial projections indicated that Brunswick could expect a new profit of $26,580 for 1967 and a net profit of $306,367 from 1969 to 1978. Francis testified that he had discussed the terms of the lease with Thomas Higgins in the presence of the Higgins' attorney and an attorney for Brunswick. At that conversation, Francis explained the lease renewal options. Francis testified that on October 29, 1965, he went to the premises with two other men from Brunswick to take possession of the business pursuant to the authorization of the receiver. He presented the lease to Thomas Higgins for execution. Higgins appeared upset and refused to execute the lease. Higgins then left the premises carrying the unsigned lease agreement. Francis denied urging Higgins to sign by making threats that he would lose the bowling alley, his home, and his other assets.

Thomas Higgins testified that Brunswick representatives informed him that pending lawsuits would be dismissed if he signed a lease for the premises. Francis, along with two other men from Brunswick, came to the bowling alley to secure his signature. They threatened to take his home, bowling alley and other assets if he refused to sign the lease. There was no

negotiation concerning the terms of the lease. Higgins further testified that he was unaware of options to renew the lease; that he did not read the lease before signing it. He was forced into signing the lease out of fear of losing his home and other properties.

Lorraine Higgins testified that she signed the lease at her home. Her husband and three representatives from Brunswick were present. One of the Brunswick representatives demanded that she sign the lease or she "would lose everything." She did not read the lease and did not want to sign it. She was forced to sign so that she would not lose her home and personal effects.

The trial court found that Brunswick had taken unfair advantage of plaintiffs' financial circumstances and that the lease was signed under duress. The court thereupon rescinded the lease, and directed Brunswick to vacate the premises and to leave its equipment on the premises. In so holding, the trial court indicated that it had never seen such "an unscrupulous and overreaching transaction."

We initially consider Brunswick's contention that the trial court erred in holding that plaintiffs were forced to sign the lease because of duress exercised by Brunswick.

■■ ■ Duress is defined as including the imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress of another, whereby his free agency is overcome. (*Stavins v. Stavins* (1979), 70 Ill. App. 3d 622, 388 N.E.2d 928; *People ex rel. Buell v. Bell* (1959), 20 Ill. App. 2d 82, 155 N.E.2d 104; *Pittsburgh Steel Co. v. Hollingshead & Blei* (1916), 202 Ill. App. 177.) To invalidate an agreement on the basis of duress, a party must show that he was induced by a wrongful act or threat of another to execute an agreement under circumstances which deprived him of the exercise of his free will. (*Kaplan v. Kaplan* (1962), 25 Ill. 2d 181, 182 N.E.2d 706; *Kaplan v. Keith* (1978), 60 Ill. App. 3d 804, 377 N.E.2d 279.) Duress does not exist merely where consent to an agreement is secured because of hard bargaining positions or the pressure of financial circumstances. (*Chouinard v. Chouinard* (5th Cir. 1978), 568 F.2d 430; *Johnson, Drake & Piper, Inc. v. United States* (Ct. Cl. 1976), 531 F.2d 1037.) In cases where agreements have been invalidated because of duress, the conduct of the party obtaining the advantage is tainted with some degree of fraud or wrongdoing. *Stavins v. Stavins*; *Borgeson v. Fairhaven Christian Home* (1971), 1 Ill. App. 3d 323, 272 N.E.2d 436.

■■ ■ In our view, plaintiffs misconceive the nature of duress as a means to invalidate an agreement. We hold that the evidence adduced at trial failed to demonstrate that Brunswick applied duress upon plaintiffs so as to justify rescission of the lease. We do not accept plaintiffs' assertion that the statements made by Brunswick representatives that plaintiffs would

lose their home and all their property unless they signed the lease agreement constituted duress where the threatened action involved no abuse of process. (*Hyde v. Lewis* (1975), 25 Ill. App. 3d 495, 323 N.E.2d 533; *Mattion v. Trustees of Schools* (1971), 2 Ill. App. 3d 1035, 279 N.E.2d 66. See also *Jack Winter, Inc. v. Koratron Co.* (N.D. Calif. 1971), 329 F. Supp. 211.) Nor can the mere threat of financial loss or impending bankruptcy constitute duress. (*Chouinard v. Chouinard.*) The fact that Brunswick informed plaintiffs of the legal consequences which would result if its claims were not settled was not illegal or wrongful. Plaintiffs in fact were in a position to lose all their property, including the bowling alley. Brunswick's conduct in requiring plaintiffs to sign the lease agreement before it would dismiss its actions against plaintiffs was also not improper. Plaintiffs' testimony failed to reveal any wrongful threats or acts on Brunswick's part. Thomas Higgins was well aware of his financial problems and straitened circumstances long before the lease was executed. Plaintiffs not only consulted with an attorney prior to the execution of the lease, but their counsel participated in the lease negotiated during the bankruptcy proceedings instituted by plaintiffs.

It seems clear that Brunswick was not responsible for plaintiffs' financial reversals. Plaintiffs had undercapitalized their business venture, and their other business interests had suffered setbacks. Indeed, the plaintiffs had other substantial creditors. In holding that Brunswick had exercised duress, the trial court emphasized that Brunswick induced the purchase of additional bowling equipment. The evidence revealed, however, that Brunswick advised plaintiffs to make the purchase to increase plaintiffs' sales revenue. At the same time, Brunswick extended the payback period so as not to increase plaintiffs' monthly payments. The record is devoid of any evidence that plaintiffs were coerced, threatened, or even pressured into purchasing the additional equipment.

Generally, the issue of duress is one of fact, to be judged in light of all circumstances surrounding a given transaction. (*Schlossberg v. E. L. Trendel & Associates, Inc.* (1978), 63 Ill. App. 3d 939, 380 N.E.2d 950; *Alexander v. Standard Oil Co.* (1977), 53 Ill. App. 3d 690, 368 N.E.2d 1010.) In the present case, however, plaintiffs have presented no facts supporting a claim of duress which would invalidate the lease agreement. We believe plaintiffs entered into the several commitments for the bowling alley on a voluntary basis and with the legal advice of counsel. While Brunswick was in a stronger economic bargaining position than plaintiffs, the record does not illustrate any abuses in Brunswick's settlement negotiations. The trial court erred in finding that plaintiffs signed the lease agreement because of duress exercised by Brunswick.

■■ We shall comment briefly on one other contention of Brunswick, its argument that plaintiffs' action is barred by laches. Laches is defined as

such neglect or omission to assert a right, taken in conjunction with a lapse of time and other circumstances causing prejudice to an adverse party, as will operate to bar relief. *Pyle v. Ferrell* (1958), 12 Ill. 2d 547, 147 N.E.2d 341; *Colucci v. Chicago Crime Com.* (1975), 31 Ill. App. 3d 802, 334 N.E.2d 461.

The mere delay in asserting a right does not constitute laches. The passage of time must have caused such a change of circumstances to the defendant that granting relief to the plaintiff would be inequitable and unjust. (*DeMarco v. University of Health Sciences* (1976), 40 Ill. App. 3d 474, 352 N.E.2d 356; *Kay v. Village of Palatine* (1970), 126 Ill. App. 2d 308, 261 N.E.2d 823.) Whether the party's delay is enough to constitute laches depends upon the circumstances of each case. *Bobin v. Tauber* (1976), 45 Ill. App. 3d 831, 360 N.E.2d 368.

■■ In the present case, plaintiffs waited 11 years to institute this action to cancel the lease. In the meantime, they had received $244,000 in rent from Brunswick. Brunswick had given up its legal rights against plaintiffs; it had also paid off other creditors of plaintiffs. We note also that during the 11 years between their execution of the lease agreement and their institution of this suit, several attorneys had reviewed the lease for plaintiffs and no action was taken. In our judgment, there had been a substantial change of circumstances between the parties as a result of the lease agreement, and the parties cannot be placed back in their original positions. Accordingly, plaintiffs action is barred by laches.

In view of our holding, it is unnecessary to consider Brunswick's other assignments of error.

For the reasons stated, the judgment of the circuit court of Cook County is reversed.

Judgment reversed.

SIMON, P. J., and McGILLICUDDY, J., concur.